1  Aram Ordubegian (SBN 185142)
2  Jerrold Abeles (SBN 138464)
   Dylan J. Yamamoto (SBN 324601)
3  **ARENTFOX SCHIFF LLP**
   555 West Fifth Street, 48th Floor
4  Los Angeles, CA  90013-1065
   Telephone:    213.629.7400
   Facsimile:    213.629.7401
5  aram.ordubegian@afslaw.com
   jerry.abeles@afslaw.com
6  dylan.yamamoto@afslaw.com

7  General Bankruptcy Counsel for Chapter 7 Trustee,
   Jeremy W. Faith
8
                 **UNITED STATES BANKRUPTCY COURT**
9
           **CENTRAL DISTRICT OF CALIFORNIA – NORTHERN DIVISION**
10

11  In re                                    Case No.  9:21-bk-10020-RC

12  **CORE SCIENTIFIC NORTH**                 Chapter 7
    **AMERICA, INC.,**
13
                        Debtor,
14

15  **JEREMY W. FAITH**, Chapter 7 Trustee   Adv. No.  _____

16                          Plaintiff,        **COMPLAINT FOR:**

17         vs.
                                              **(1) BREACH OF FIDUCIARY DUTY;**
18  **CORE SCIENTIFIC NORTH**                 **(2) AIDING AND ABETTING BREACH**
    **AMERICA, INC.**, a Delaware domestic       **OF FIDUCIARY DUTY;**
19  business corporation; **CORE SCIENTIFIC** **(3) AVOIDANCE OF FRAUDULENT**
    **CREATIONS LTD.**, an Israeli corporation;   **TRANSFERS WITH ACTUAL**
20  **COREVA HEALTH SCIENCE LLC**, a             **INTENT [11 U.S.C. § 544(b)];**
    California limited liability company;     **(4) AVOIDANCE OF FRAUDULENT**
21  **DAMIAN DELFINO**, an individual;           **TRANSFERS WITH ACTUAL**
    **CRAIG BLUTH**, an individual; and          **INTENT [11 U.S.C. § 548(a)(1)(A)];**
22  **CASSIE INGLIS**, an individual,         **(5) AVOIDANCE OF**
                                                 **CONSTRUCTIVELY FRAUDULENT**
23                          Defendants.          **TRANSFERS [11 U.S.C. §**
                                                 **548(a)(1)(B)];**
24                                            **(6) AVOIDANCE OF PREFERENTIAL**
                                                 **TRANSFERS [11 U.S.C. § 547];**
25                                            **(7) AVOIDANCE OF UNAUTHORIZED**
                                                 **POSTPETITION TRANSFERS [11**
26                                               **U.S.C. § 549];**
                                              **(8) RECOVERY AND PRESERVATION**
27                                               **OF AVOIDED TRANSFERS;**
                                              **(9) CONVERSION;**
28                                            **(10) INTENTIONAL INTERFERENCE**
                                                 **WITH PROSPECTIVE ECONOMIC**

ADVANTAGE;
**(11) NEGLIGENT INTERFERENCE
WITH PROSPECTIVE ECONOMIC
ADVANTAGE;
(12) ACCOUNTING; AND
(13) SUBSTANTIVE CONSOLIDATION**

*[SUMMONS TO BE ISSUED]*

Jeremy W. Faith, the duly appointed chapter 7 trustee (the "Trustee" or "Plaintiff") for the bankruptcy estate (the "Estate") of the debtor Core Scientific North America, Inc. (the "Debtor"), complaining of the Debtor, Core Scientific Creations Ltd. (the "Parent"), Coreva Health Science LLC ("Coreva"), Damian Delfino ("Delfino"), Craig Bluth ("Bluth"), and Cassie Inglis ("Inglis") (collectively, the "Defendants"), alleges as follows:

## I.

## SUMMARY OF ACTION

1. In 2016, the Debtor was formed by the Parent to ostensibly serve as the Parent's distribution arm in North America to distribute the Parent's WoundClot product. However, since the Debtor was formed, its separate legal existence from the Parent has been consistently and continuously ignored by its management and the Parent, which has instead operated as one unit with the Debtor and used the Debtor for its own benefit and convenience. Similarly, the Debtor's officers and directors—Delfino, Bluth, and Inglis—committed numerous acts and omissions in violation of their fiduciary duty, including allowing or causing: (1) the Debtor to operate without observing the corporate formalities; (2) the Debtor to pay expenses on behalf of the Parent, despite the Debtor being insolvent; (3) the Debtor to be undercapitalized from its inception; and (4) the Debtor and Parent to be treated as one for the purposes of doing business with customers and investors. The Debtor held no intellectual property, real property, or anything else of value.

2. As a result, the operations of the Debtor and the Parent have been inextricably linked from the beginning. The Debtor is 100% owned by the Parent, and most of the Debtor's officers and employees had functionally the same roles in the Parent. Apparently, the Parent's CEO and management informally oversaw and managed the Debtor and would make decisions via phone

call and without formal documentation. And, on the Debtor's side, the Debtor's board of directors, while it may have been originally constituted on paper, apparently did not hold meetings or keep minutes.

3.      From a financial perspective, the Debtor does not appear to have ever made enough money from its business—selling WoundClot to distributors—to cover its payroll or other expenses. Nevertheless, the Debtor routinely paid expenses on behalf of the Parent without necessarily receiving any value in return from the Parent,

4.      And, when the Debtor did receive value from the Parent, this was again achieved through informal and irregular means. From about 2017 to 2020, the Parent issued convertible notes (the "Convertible Notes") to investors to raise money for the Parent in Israel. However investors sent the money first to the Debtor in California, which was supposed to immediately send the money to the Parent in Israel. Instead, before sending the funds to the Parent, the Debtor would, at times, retain some of these funds in order to offset certain expenses paid on behalf of the Parent. This process was, again, not governed by any formal agreement between the Debtor and Parent, nor was it contemplated in the Convertible Notes that some of the funds would be retained by the Debtor. However, this simply seems to be how the Debtor was operated: as a piece of the Parent, without a substantively separate existence.

5.      The Debtor also shared offices with Coreva, a company manufacturing a similar product to WoundClot, and that was also owned by Bluth, Delfino, and Inglis. Since the Debtor ceased operations, Coreva has apparently been fulfilling orders placed to the Debtor and the Parent.

6.      As a result of these numerous acts and omissions by the Debtor's officers and directors, as well as the Parent and Coreva, the Debtor's Estate has suffered great financial harm.

## II.

## JURISDICTION AND VENUE

7.      This adversary proceeding arises in and relates to the chapter 7 case *In re Core Scientific North America, Inc.*, which is now pending before the United States Bankruptcy Court for the Central District of California, Case No. 9:21-bk-10020-RC.

8.      This adversary proceeding is commenced pursuant to Rule 7001, *et seq.* of the

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

AFDOCS/25583570.6

1    Federal Rules of Bankruptcy Procedure; 11 U.S.C. §§ 544, 547, 548, 549, 550, and 551; as well as

2    Cal. Civ. Code §§ 3439.04, 3439.05, and 3439.07.

3         9.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§

4    157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. § 1409, in that the instant

5    proceeding is related to the Debtor's pending bankruptcy case.  This adversary proceeding is a core

6    proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (F), and the Court can and should enter final

7    judgment.

8    **III.**

9    **THE PARTIES**

10        10.     The Trustee brings this action solely in his capacity as the Chapter 7 Trustee of the

11   Debtor's Estate.

12        11.     Core Scientific North America, Inc. is the debtor in this bankruptcy case, and, on

13   information and belief, a corporation incorporated under the laws of the state of Delaware.  On

14   information and belief, the Debtor is owned 100% by the Parent.

15        12.     Core Scientific Creations Ltd. is, on information and belief, the parent company and

16   100% owner of the Debtor and is based in Israel.  On information and belief, the Parent is owned

17   by Delfino, Bluth, Inglis, and several other individuals, including certain of the Parent's officers

18   and directors as well as investors.

19        13.     Coreva Health Science LLC is, on information and belief, a limited liability

20   company formed under the laws of the state of California.  On information and belief, Coreva is

21   primarily owned by Bluth, and Inglis and Delfino are, or have been, partial owners as well.

22        14.     Damian Delfino is, on information and belief:

23             a.     One of the largest shareholders of the Parent;

24             b.     A corporate director of the Parent; and

25             c.     The Debtor's de facto chief operating officer.

26        15.     Craig Bluth is, on information and belief:

27             a.     One of the largest shareholders of the Parent;

28             b.     The vice president of strategic partnerships of the Parent;

1          c.      A corporate director of the Debtor; and

2          d.      The Debtor's president.

3    16.   Cassie Inglis is, on information and belief:

4          a.      A shareholder of the Parent;

5          b.      The Parent's director of administration;

6          c.      A corporate director of the Debtor; and

7          d.      The Debtor's chief administrative officer.

8                              **IV.**

9                    **GENERAL ALLEGATIONS**

10   **A.    Background**

11   17.   On January 11, 2021 (the "Petition Date"), the Debtor filed the underlying chapter

12   7 bankruptcy case, Bankruptcy Case No. 9:21-bk-10020-RC.

13   18.   On information and belief, the Parent manufactures WoundClot, a hemostatic

14   dressing to stop bleeding, in Israel, which it then ships to distributors around the world.

15   19.   On information and belief, the Debtor was formed in 2016 by the Parent to sell the

16   Parent's WoundClot product in North America.

17   20.   On information and belief, the Debtor was intended to control distribution of

18   WoundClot and was listed as the initial importer to receive the product and deal with customs on

19   behalf of the Parent.  However, on information an belief, the Debtor does not, and did not ever,

20   have any formal distribution agreement with the Parent.

21   **B.    Throughout Its Existence, the Debtor Has Not Observed Corporate Formalities and**

22   **Has Been Operated Informally By, and As a Single Unit With, the Parent.**

23   21.   On information and belief, Bluth, Inglis, and the Parent's CEO (at the time) Yuval

24   Yaskil ("Yaskil") were appointed to the Debtor's board of directors, but the board appears to have

25   existed in name only, having no operational control or oversight of the Debtor.

26   22.   On information and belief, the Debtor's board was never convened, and there were

27   no board minutes or other records of corporate proceedings throughout the Debtor's existence.

28   23.   On information and belief, the majority of the Debtor's officers and directors, as

well as some of the Debtor's employees, held similar, if not functionally identical, positions in the Parent. In particular, on information and belief, Bluth and Inglis held corporate positions in both the Debtor and Parent, in addition to being owners of Coreva, and would deal with issues pertaining to both companies at the same time.

24.    Furthermore, on information and belief, Delfino has acted, pre- and postpetition, as the Debtor's de facto chief operating officer despite having no official role in the Debtor and only based on his ownership of the Parent in order to "protect [his] investment." The Court has not approved Delfino's role as chief operating officer, or any other senior management role at the Debtor.

25.    On information and belief, the Debtor and Parent had no formalized agreement regarding how the Parent and Debtor's relationship would be managed.

26.    Instead, on information and belief, the Parent's board was always aware of the Debtor's activities, and the Parent's CEO Steve Nielsen ("Nielsen") "supervised" the actions taken by the Debtor's officers and directors, who would run decisions by Nielsen for approval prior to proceeding.

27.    On information and belief, the Debtor's management would often meet with the Parent's management by phone, and the Parent would approve the Debtor's corporate business dealings, such as the issuance of payments between the two entities, via phone call, without any formal or written authorization or documentation.

28.    On information and belief, the Parent entered into contracts with at least one distributor, Pro1Tek, and later forced Pro1Tek to instead do business with the Debtor by refusing to provide product under the contracts unless Pro1Tek purchased product through the Debtor in North America. Despite this change, the Pro1Tek contracts with the Parent were never amended, and the Parent and Debtor, while requiring Pro1Tek to communicate with and receive product from the Debtor, still required payment to be made to the Parent in Israel.

29.    On information and belief, orders placed to the Debtor and Parent—under contracts that existed prepetition—are now being fulfilled by Coreva instead. For example, the shipments being received by distributors are marked as coming from Coreva, rather than the Debtor or Parent.

30.    On information and belief, the Debtor and the Parent have been operated by their (shared) owners and management fluidly based on convenience and for the benefit of the Parent. Accordingly, customers, investors, vendors, and others have been led to treat both companies as a single operational unit, as opposed to separate and distinct legal entities.

**C.    The Debtor Was Undercapitalized From the Time It Was Created By the Parent, and Relied on Ad Hoc Contributions From the Parent's Insiders, Even Though It Also Was Routinely Sending Money to the Parent.**

31.    On information and belief, although the Debtor was created by the Parent to be its distribution arm in North America, the Parent never properly capitalized the Debtor.

32.    On information and belief, the Debtor owned no intellectual property or real property, and had few assets, other than the stock of WoundClot on hand at a given time.

33.    As a result, on information and belief, the Debtor was never able to even regularly meet its payroll, and often relied on ad hoc capital contributions from the Parent and/or the Parent's shareholders in order to continue operations.

34.    On information and belief, Delfino loaned the Debtor over $1 million prepetition (in several different loans) to help the Debtor and Parent cover various expenses.  These loans were apparently undocumented by either company.  These expenses included various debts of the Parent, which in early 2019, was apparently facing the prospect of bankruptcy in Israel.

35.    On information and belief, on or about January 10, 2019, one such loan to the Debtor was made by Delfino's friend, Dan Ragsdale ("Ragsdale") through his company Ragsdale Incorporated, in the amount of $200,000.  On information and belief, Ragsdale wired $200,000 to the Debtor.  On information and belief, this transfer was so that the Parent could meet expenses in Israel, and Ragsdale wired the funds to the Debtor in Delfino's name, so that the Debtor could then send the funds to the Parent.  It is not yet known whether the Debtor actually transferred (all of) the funds to the Parent.  On information and belief, this was to shorten the process of Ragsdale lending the money to Delfino, who would then loan the money to the Parent.

36.    Similarly, on information and belief, one of the Parent's investors, Michael Cavalier ("Cavalier") also loaned the Debtor several hundred thousand dollars to help the Parent and Debtor

ArentFox Schiff LLP
Attorneys At Law
Los Angeles

- 7 -

cover various expenses.  On information and belief, these include two transfers of $100,000 each, made on January 9, 2019 and January 18, 2019, respectively, again to help the Parent cover expenses.

37.    On information and belief, the Debtor also would wire funds to the Parent so that the Parent could meet payroll and other business expenses, despite the fact that the Debtor itself could normally not meet its own payroll and business expenses.

38.    In the Debtor's Amended Statement of Financial Affairs [Dkt. No. 30], the Debtor scheduled 25 distinct transfers to the Parent during the two-year period leading up to the Petition, in the total amount of $1,763,500.00.  The transfers to the Parent are listed below:

| Date | Transferee | Transfer Amount |
|------|-----------|-----------------|
| January 14, 2019 | Core Scientific Creations Ltd. | $     165,000.00 |
| January 14, 2019 | Core Scientific Creations Ltd. | $     165,000.00 |
| January 22, 2019 | Core Scientific Creations Ltd. | $       90,000.00 |
| March 1, 2019 | Core Scientific Creations Ltd. | $     175,000.00 |
| March 11, 2019 | Core Scientific Creations Ltd. | $       80,000.00 |
| March 27, 2019 | Core Scientific Creations Ltd. | $       40,000.00 |
| March 27, 2019 | Core Scientific Creations Ltd. | $     100,000.00 |
| May 2, 2019 | Core Scientific Creations Ltd. | $     100,000.00 |
| May 31, 2019 | Core Scientific Creations Ltd. | $     100,000.00 |
| June 25, 2019 | Core Scientific Creations Ltd. | $       75,000.00 |
| July 8, 2019 | Core Scientific Creations Ltd. | $       10,000.00 |
| July 22, 2019 | Core Scientific Creations Ltd. | $     200,000.00 |
| August 19, 2019 | Core Scientific Creations Ltd. | $       20,000.00 |
| August 26, 2019 | Core Scientific Creations Ltd. | $       65,000.00 |
| September 4, 2019 | Core Scientific Creations Ltd. | $       10,000.00 |
| September 5, 2019 | Core Scientific Creations Ltd. | $       10,000.00 |
| September 17, 2019 | Core Scientific Creations Ltd. | $       50,000.00 |

ArentFox Schiff LLP
Attorneys At Law
Los Angeles

| November 7, 2019 | Core Scientific Creations Ltd. | $ 25,500.00 |
| November 22, 2019 | Core Scientific Creations Ltd. | $ 15,000.00 |
| December 4, 2019 | Core Scientific Creations Ltd. | $ 45,000.00 |
| December 5, 2019 | Core Scientific Creations Ltd. | $ 30,000.00 |
| January 3, 2020 | Core Scientific Creations Ltd. | $ 60,000.00 |
| January 29, 2020 | Core Scientific Creations Ltd. | $ 22,000.00 |
| January 31, 2020 | Core Scientific Creations Ltd. | $ 16,000.00 |
| March 26, 2020 | Core Scientific Creations Ltd. | $ 95,000.00 |
| | **Total** | **$ 1,763,500.00** |

39.     These transfers far exceed the Debtor's gross revenue for the period from 2018 to the Petition Date of $546,707.20.

**D.    The Debtor Paid Expenses of the Parent On an Ongoing Basis Without Receiving Reasonably Equivalent Value in Return.**

40.     On information and belief, in addition to making numerous monetary transfers to the Parent, the Debtor repeatedly and on a recurring basis paid expenses for the Parent without receiving reasonably equivalent value in return.  Specifically, the Debtor scheduled the following creditor in its Schedule E/F, for whom the scheduled claims appear to be, at least in part, based on expenses paid on behalf of the Debtor:

| Creditor | Scheduled Claim Amount | Scheduled Basis for Claim |
| --- | --- | --- |
| Protorae Law Group PLLC | $200,819.90 | Lawyer |

41.     In addition, the Debtor listed the following transferees in its Amended Statement of Financial Affairs, to whom payment appears to have been, at least in part, on behalf of the Parent:

| Creditor | Total Amount of Transfers | Relationship to Debtor |
| --- | --- | --- |
| Firon Law | $20,000 | Legal in Israel for Parent Company (intercompany) |
| Meitar Law | $40,000 | Legal in Israel for Parent Company (intercompany) |

| | | |
|---|---|---|
| Potomac Law Group PLLC | $20,145 | Patent filings on behalf of Parent Company (intercompany) |
| FDA | $4,884 | Registration on behalf of Parent Company CSC Ltd. (intercompany) |
| Rheolution Instruments | $4,500 | Product Testing Research behalf of Parent CSC Ltd. (intercompany) |
| Yuval Yaskil | $75,000 | Former CEO of parent corp. |
| Scott Hospes | $108,340.28 | Loan repayment on behalf of parent corp. |
| Van Decoteau | $15,500 | Loan repayment on behalf of parent corp. |
| Ronald Stein | $36,000 | Loan repayment on behalf of parent corp. |

42.    On information and belief, among the expenses paid by the Debtor on behalf of the Parent were fees for legal work apparently performed on behalf of the Parent and Coreva, including, but not limited to:

   a.    Drafting and preparing convertible notes through which investors would lend money to the Parent;

   b.    Correspondence and strategizing with Meitar Law Offices, an Israeli law firm that the Debtor also listed as a recipient of transfers from the Debtor on behalf of work performed for the Parent;

   c.    International regulatory issues;

   d.    Preparing employee stock ownership plans and the related grant documents;

   e.    Evaluation of IP theft by former employees;

   f.    Review of the Parent's and Coreva's patent portfolios;

   g.    Purchase and assignment agreements related to Coreva trademarks;

   h.    Developing trademark strategy;

   i.    Developing patent prosecution strategy; and

   j.    Preparing trademark applications.

43.    On information and belief, this legal work could only pertain to the Parent and/or Coreva, as only the Parent and Coreva, not the Debtor, held any intellectual property.

44.    Similarly, correspondence produced by Protorae Law, which invoiced the Debtor

1    for hundreds of thousands of dollars in legal work, indicate that work was performed in connection

2    with the Debtor, the Parent, and Coreva, although all billing appears to have been sent to the Debtor.

3    **E.**    **The Parent Raised Money By Issuing Convertible Notes, But the Funds Were First**

4          **Transferred to the Debtor.**

5          45.    On information and belief, between about 2017 and 2020, the Parent issued the

6    Convertible Notes to raise money from investors.    On information and belief, most of the

7    Convertible Notes provided for annual interest of 6.5%, accruing after the Parent received the

8    principal amount from the note holder.

9          46.    On information and belief, only the Parent issued the Convertible Notes.    The

10    Convertible Notes provided that they would automatically convert into ordinary shares in the Parent

11    if the Parent reached a certain financing milestone prior to the maturity date.

12          47.    On information and belief, the Convertible Notes were issued by the Parent,

13    purportedly to raise money for the Parent.

14          48.    However, on information and belief, the investors typically wired the funds to the

15    Debtor; Delfino has alleged that it was cheaper and quicker for the Debtor to wire the funds to the

16    Parent than for the individual investors to do so.    The Debtor was then supposed to wire the funds

17    to the Parent in Israel.

18          49.    On information and belief, the Convertible Notes did not purport to raise money on

19    behalf of the Debtor, nor did they contemplate the Debtor's involvement in the issuance, repayment,

20    or conversion of the Convertible Notes.

21          50.    On information and belief, on some occasions the Debtor retained some of the funds

22    received by investors in connection with the Convertible Notes and wired the remainder to the

23    Parent.  This arrangement was made, on information and belief, to offset certain expenses paid for

24    by the Debtor on behalf of the Parent.

25          51.    On information and belief, the Debtor and Parent had no intercompany agreements

26    governing this offsetting process or the process by which the investors would send the investment

27    funds first to the Debtor, which was then supposed to wire the same funds immediately to the Parent

28    in Israel.

52.     On information and belief, the Convertible Notes are owing and are past due.

53.     On information and belief, postpetition in 2022, a new investor in the Parent has made a large investment in the Parent, and the Parent paid certain holders of Convertible Notes in full, with interest.

**F.      Coreva Has Also Been Closely Intertwined with the Debtor, and Now Apparently Has Taken Over At Least Part of the Debtor's Business.**

54.     On information and belief, Coreva is owned by Bluth, Inglis, and Delfino.   In addition to their roles in the Debtor and the Parent, Bluth and Inglis also operate and manage Coreva.

55.     On information and belief, the Debtor shared office space with Coreva, which sublet part of its own office space to the Debtor.  The Debtor scheduled Coreva as an unsecured creditor in the amount of $17,000 on the basis of "Office Space."

56.     On information and belief, the Debtor used Coreva's offices because Bluth and Inglis already worked there.

57.     On information and belief, Coreva distributes a hemostatic gauze product under the trademark ActCel, which is similar to WoundClot.

58.     On information and belief, the Debtor, Parent, and Coreva were, at one point, involved in negotiating the assignment and purchase of trademarks from Coreva.

59.     On information and belief, the Debtor has ceased to operate postpetition, but its business operations, assets, and employees have been transferred to and assumed by the Parent and Coreva—which is now fulfilling orders placed to the Debtor and Parent—to the detriment of the Estate.

**G.      The Parent and Coreva Are Alter Egos of the Debtor.**

60.     On information and belief, there is—and at all relevant times was—a unity of interest and ownership between the Debtor and the Parent, such that there is no individuality and separateness between the Debtor and the Parent, and the Parent is an alter ego of the Debtor, in that, among other things:

a.      The Parent completely controlled, dominated, managed, and operated the

Debtor for its own benefit, so that resources and business opportunities and relationships were transferred to or taken from the Debtor in order to convenience and benefit the Parent;

b.      The corporate formalities were completed disregarded by the Debtor, which was managed by its officers and directors for the benefit of the Parent, which was also owned by the Debtor's officers and directors; and

c.      The Debtor did not hold board meetings or keep records or minutes of corporate proceedings, and the business of the Debtor was closely intertwined with that of the Parent, whose management apparently was greatly involved in and had final say regarding the Debtor's operations.

61.      On information and belief, the Debtor's corporate documents are themselves inconsistent in even the name of the Debtor.  For example, the Debtor's certificate of incorporation provide the Debtor's name as "CSC North America, Inc.," while the Debtor is registered in Delaware as (and the Debtor's bankruptcy petition provide that the Debtor's name is) "Core Scientific North America, Inc." This inconsistency in naming convention is evident also in invoices from the Debtor's vendors, which refer to both apparent names.  Delfino and others also sent emails in which the signatures indicated they were with "Core Scientific Creations-North America."

62.      The variations of the Debtor's name further blur the distinction between the Parent and the Debtor, as the Parent is often referred to as "CSC Ltd."

63.      On information and belief, there is—and at all relevant times was—a unity of interest and ownership between the Debtor and Coreva, such that there is no individuality and separateness between the Debtor and Coreva, and Coreva is an alter ego of the Debtor, in that, among other things:

a.      The owners of Coreva completely controlled, dominated, managed, and operated the Debtor for Coreva's own benefit, so that resources and business opportunities and relationships were transferred to or taken from the Debtor in order to convenience and benefit Coreva; and

b.      The Debtor shared premises and personnel with Coreva, and subsequent to

the Debtor's bankruptcy filing, the Debtor's business operations, assets, and employees have been apparently transferred to and assumed by Coreva, without the Court's permission.

64.    As a result, on information and belief, it would be inequitable for the Debtor to assert the separate corporate statuses of the Parent and Coreva in order to insulate these entities' assets from the claims against the Debtor.

### FIRST CLAIM FOR RELIEF

**Breach of Fiduciary Duty Against Defendants Damian Delfino, Craig Bluth, and Cassie Inglis**

65.    The Trustee realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

66.    During the relevant period, Delfino, Bluth, and Inglis were officers and/or directors of the Debtor, and as such, owed fiduciary duties of care and loyalty to the Debtor and owed a duty not to engage in self-dealing conduct that could harm the Debtor.  In addition, these Defendants also owed a duty of care to act with minimal competency to ensure that the Debtor was operated in accordance with the law, as well as a duty of loyalty to avoid placing their own interests ahead of the Debtor's interests.

67.    Moreover, Delfino, Bluth, and Inglis owed the same fiduciary duties to the Debtor's creditors because the Debtor was insolvent.

68.    Consequently, per the allegations herein, these Defendants breached their fiduciary duties as officers and directors of the Debtor.

69.    The fiduciary duties of loyalty and good faith required that these Defendants act in the best interests of the Debtor and its creditors rather than the Defendants' own self-interest, and to correspondingly refrain from self-dealing, conflicts of interest, and prioritizing their own personal gain at the expense of the Debtor.  Additionally, these Defendants were also required to avoid acting for purposes other than advancing the Debtor's and its creditors' best interests and to avoid failing to act when they had a known duty to act.

70.    Additionally, these Defendants were required under the duties of loyalty and good

faith to exercise a level of diligence in operating the Debtor's business such that they did not act grossly negligent or disregard corporate formalities and financial reality.

71.    These Defendants committed numerous acts and omissions in blatant violation of law or policy giving rise to claims for breach of fiduciary duty, including, but not limited to:

a.    Operating the Debtor and Parent (or allowing the Debtor and Parent to be operated) as if they were a single entity rather than separate corporations;

b.    Ignoring the conflicts of interest in the Debtor's and other Defendants' relationships to the Parent and Coreva, of which Delfino, Bluth, and Inglis were shareholders;

c.    Failing to follow the corporate formalities with the Debtor, including holding board meetings and keeping minutes;

d.    Operating the Debtor (and Parent) in an informal manner, via phone calls and without full documentation of intercompany dealings;

e.    Allowing the Parent to undercapitalize the Debtor;

f.    Failing to complete any intercompany agreements between the Debtor and Parent relating to the Debtor's distribution of WoundClot or governing the Debtor's paying certain of the Parent's expenses, and how such payments would be repaid;

g.    Raising funds on behalf of the Parent, yet allowing the funds to be routed first through the Debtor, which offset some of the expenses it had paid on behalf of the Parent prior to sending the remaining funds to the Parent;

h.    Transferring the Debtor's business operations (and employees) to the Parent and Coreva postpetition; and

i.    Causing the Parent to repay certain investors postpetition with interest.

72.    These breaches of fiduciary duty directly contributed to the Debtor filing for bankruptcy and depleted the Estate's assets, and thereby damaged the Debtor in an amount to be proven at trial, but currently estimated to be at least $2.2 million.

///

///

**<u>SECOND CLAIM FOR RELIEF</u>**

**Aiding and Abetting Breach of Fiduciary Duty Against Defendants Damian Delfino, Craig**

**Bluth, and Cassie Inglis**

73.    The Trustee realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

74.    To the extent that Delfino, Bluth, or Inglis did not owe fiduciary duties of care and loyalty to the Debtor, these Defendants provided material assistance to the other Defendants in their respective breaches of fiduciary duty, in blatant violation of law or policy,  including, among other things:

> a.    Operating the Debtor and Parent (or allowing the Debtor and Parent to be operated) as if they were a single entity rather than separate corporations;

> b.    Ignoring the conflicts of interest in the Debtor's and other Defendants' relationships to the Parent and Coreva, of which Delfino, Bluth, and Inglis were shareholders;

> c.    Failing to follow the corporate formalities with the Debtor, including holding board meetings and keeping minutes;

> d.    Operating the Debtor (and Parent) in an informal manner, via phone calls and without full documentation of intercompany dealings;

> e.    Allowing the Parent to undercapitalize the Debtor;

> f.    Failing to complete any intercompany agreements between the Debtor and Parent relating to the Debtor's distribution of WoundClot or governing the Debtor's paying certain of the Parent's expenses, and how such payments would be repaid;

> g.    Raising funds on behalf of the Parent, yet allowing the funds to be routed first through the Debtor, which offset some of the expenses it had paid on behalf of the Parent prior to sending the remaining funds to the Parent;

> h.    Transferring the Debtor's business operations (and employees) to the Parent and Coreva postpetition; and

> i.    Causing the Parent to repay certain investors postpetition with interest.

75.     As a direct and proximate result of these Defendants aiding and abetting the other Defendants' breaches of fiduciary duty, the Debtor and its Estate have been damaged in an amount to be proven at trial, but currently estimated to be at least $2.2 million.

### THIRD CLAIM FOR RELIEF

**Avoidance of Actual Fraudulent Transfer Against All Defendants**

**[11 U.S.C. §§ 544(b) and 550; and Cal. Civ. Code §§ 3439.04(a)(1), 3439.05, and 3439.07]**

76.     The Trustee realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

77.     The transfers by the Debtor discussed above, including those made for the benefit of the Parent and Coreva (the "Transfers"), were made by the Debtor with the actual intent to hinder, delay, or defraud the Debtor's creditors.[1]  Specifically, the Debtor made the Transfers even though it knew, or either consciously or recklessly chose to ignore, facts known to the Debtor that strongly suggested that the Transfers would leave the Debtor insolvent and unable to pay its debts as they became due in the ordinary course of business.

78.     At all relevant times within the four years immediately preceding the Petition Date, the Debtor (i) was insolvent, or became insolvent as a result of each of the Transfers, (ii) was engaged in or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

79.     The other Defendants did not provide the Debtor with reasonably equivalent value for the Transfers and did not receive the Transfers in good faith.  Specifically, the Defendants knew, or either consciously or recklessly chose to ignore, facts known to them that strongly suggested that the consideration, if any, that the Defendants provided for the Transfers conferred no or less than reasonably equivalent value upon the Debtor.

80.     At all relevant times, the Transfers were voidable under Cal. Civ. Code

---

[1] To the extent that any of the Transfers are deemed "subsequent transfers" after transfers from the Debtor, the Trustee seeks recovery from these Defendants as subsequent transferees, or initial transferees, according to proof at trial.

ArentFox Schiff LLP
Attorneys At Law
Los Angeles

AFDOCS/25583570.6

§§ 3439.04(a)(1), 3439.05, and 3439.07 by one or more creditors who held and hold unsecured claims against the Debtor that were and are allowable against its bankruptcy estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e).

81.     The acts of the Defendants, and each of them, were undertaken for improper purposes as alleged above and were willful, wanton, deliberate, malicious, and in conscious disregard of the rights of the Estate's creditors, and were designed and intended to cause and did, in fact, cause the Estate's creditors to suffer actual damages and therefore justify the awarding of exemplary and punitive damages.

82.     The Trustee seeks all available relief under Cal. Civ. Code § 3439.07, including exemplary damages.

83.     By reason of the foregoing, the Trustee may avoid the Transfers under 11 U.S.C. § 544(b) and Cal. Civ. Code §§ 3439.04(a)(1), 3439.05, and 3439.07.

## FOURTH CLAIM FOR RELIEF

### Avoidance of Actual Fraudulent Transfer Against All Defendants

### [11 U.S.C. § 548(a)(1)(A)]

84.     The Trustee realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

85.     Certain Transfers of the Debtor's monies and property to the Defendants occurred within the two (2) years prior to the Petition Date.

86.     Accordingly, these Transfers are avoidable, and should be avoided, as fraudulent pursuant to 11 U.S.C. § 548(a)(1)(A).

## FIFTH CLAIM FOR RELIEF

### Avoidance of Constructively Fraudulent Transfer Against All Defendants

### [11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550; and Cal. Civ. Code §§ 3439.04(a)(2), 3439.05, and 3439.07]

87.     The Trustee realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

88.     On  information and belief, the Debtor did not receive reasonably equivalent value

in exchange for any of the Transfers of the Debtor's monies and property.

89.     At the time of each of the Transfers, the Debtor either:

a.     Was insolvent on the dates the Transfers were made, or became insolvent as a result thereof;

b.     Was engaged or was about to engage in a business or a transaction for which any property remaining of the Debtor was of unreasonably small capital; or

c.     Intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured.

90.     On information and belief, the Debtor was insolvent, or became insolvent as a result of each of the Transfers.

91.     On information and belief, the Debtor was not paying debts as they came due, including but not limited to the following:

a.     Payroll owed to its employees;

b.     Legal and consulting fees owed to professionals; and

c.     Fees owed to other vendors.

92.     On information and belief, there exist other creditors of the Debtor whose claims arose before each of the Transfers were made.

93.     The acts of the Defendants, and each of them, were undertaken for improper purposes as alleged above and were willful, wanton, deliberate, malicious, and in conscious disregard of the rights of the Estate's creditors, and were designed and intended to cause and did, in fact, cause the Estate's creditors to suffer actual damages and therefore justify the awarding of exemplary and punitive damages.

94.     The Plaintiff seeks all available relief under Cal. Civ. Code § 3439.07, including exemplary damages.

95.     Accordingly, the Transfers are avoidable, and should be avoided, as constructively fraudulent pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B) and 550, and Cal. Civ. Code §§ 3439.04(a)(2), 3439.05, and 3439.07.

///

1

## SIXTH CLAIM FOR RELIEF

2

**Avoidance of Preferential Transfer from the Debtor Against All Defendants**

3

**[11 U.S.C. § 547]**

4   96.    The Trustee realleges and incorporates herein by reference each and every allegation

5   contained in all prior paragraphs of this Complaint.

6   97.    To the extent any Transfers were made by the Debtor as repayment of loans from

7   the Defendants, the Trustee seeks to avoid as preferential under 11 U.S.C. § 547 these transfers

8   occurring during the one-year period immediate preceding the Petition Date (the "Preference

9   Period").

10   98.    To the extent any Transfers were made by the Debtor to the Defendants as

11   repayment of any antecedent debt, the Trustee seeks to avoid as preferential under 11 U.S.C. § 547

12   these transfers occurring during the Preference Period.

13   99.    On information and belief, these Defendants each qualify as an "insider" under 11

14   U.S.C. § 101.

15   100.    During the Preference Period, the Debtor made certain Transfers to or for the benefit

16   of the Defendants in an aggregate amount to be determined as trial.

17   101.    The Transfers constituted transfers of the Debtor's interest in property.

18   102.    The Transfers were to or for the benefit of a creditor within the meaning of

19   § 547(b)(1) because each Transfer either reduced or fully satisfied a debt or debts then owed by the

20   Debtor to the Defendants.

21   103.    The Transfers were made for, or on account of, an antecedent debt or debts owed by

22   the Debtor to the Defendants.

23   104.    On information and belief, the Debtor was insolvent, or became insolvent as a result

24   of each of the Transfers.  Pursuant to 11 U.S.C. § 547(f), the Trustee is entitled to the presumption

25   of insolvency for each one of the Transfers that occurred during the 90-day period immediately

26   preceding the Petition Date.

27   105.    As a result of certain Transfers, the Defendants received more than the Defendants

28   would have received if: (i) the Transfers has not been made, and (ii) the Defendants received

1   payments of their debts under the provisions of the Bankruptcy Code.  As evidenced by the Debtor's

2   bankruptcy schedules as well as the proofs of claim that have been received to date, the Debtor's

3   liabilities exceed their assets to the point that unsecured creditors likely will not receive a full

4   payout of their claims from the Debtor's Estate.

5       106.   In accordance with the foregoing, certain Transfers are avoidable pursuant to 11

6   U.S.C. § 547(b).

7                **SEVENTH CLAIM FOR RELIEF**

8      **Avoidance of Unauthorized Post-Petition Transfer Against All Defendants**

9                   **[11 U.S.C. § 549]**

10      107.   The Trustee realleges and incorporates herein by reference each and every allegation

11   contained in all prior paragraphs of this Complaint.

12      108.   To the extent that the Parent made any of the Transfers following the Petition Date,

13   and these Transfers were not authorized by the Court or the Bankruptcy Code (the "Postpetition

14   Transfers"), the Trustee pleads that such Postpetition Transfers are avoidable pursuant to 11 U.S.C.

15   § 549.

16                **EIGHTH CLAIM FOR RELIEF**

17      **Recovery and Preservation of Avoided Transfers Against All Defendants**

18               **[11 U.S.C. §§ 550 and 551]**

19      109.   The Trustee realleges and incorporates herein by reference each and every allegation

20   contained in all prior paragraphs of this Complaint.

21      110.   The Transfers were either (i) incurred and made with the actual intent to hinder,

22   delay, or defraud creditors of the Debtor; or (ii) were made for less than reasonably equivalent value

23   when the Debtor was insolvent or not paying their debts as they came due.

24      111.   Accordingly, each of the Transfers made by the Debtor should be avoided as

25   fraudulent as set forth in the Trustee's Third through Seventh Claims, above, and such property, or

26   the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to

27   11 U.S.C. § 550.

28   ///

## NINTH CLAIM FOR RELIEF

### Conversion Against All Defendants

112.    The Trustee realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

113.    As described above, the Debtor disposed of its assets to the Defendants or entities owned by the Defendants leading up, and subsequent, to this bankruptcy case, despite the Debtor's own dire financial circumstances.

114.    These assets are rightfully the property of the Debtor's Estate, as they were transferred to the Debtor's insiders or entities controlled by the Debtor's insiders, who used the Debtor for their own convenience and benefit, and disregarded the Debtor's separate legal existence.

115.    Consequently, the recipients of these assets now wrongfully have control over the Debtor's assets, in an amount which shall be proven at trial, but currently estimated to be at least $2.2 million, which are rightfully Estate property.

## TENTH CLAIM FOR RELIEF

### Intentional Interference with Prospective Economic Advantage Against Defendants Core Scientific Creations Ltd., Coreva Health Science LLC, Damian Delfino, Craig Bluth, and Cassie Inglis

116.    The Trustee realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

117.    As described above, the Debtor had relationships with a number of distributors and customers, to whom the Debtor sold the WoundClot product, and that contained a probable future economic benefit to the Debtor.

118.    As officers of the Debtor, Delfino, Bluth, and Inglis were aware of those economic relationships.  Similarly, the Parent and Coreva were also aware of those economic relationships due to their sharing the same management and ownership.

119.    Nevertheless, Delfino, Bluth, Inglis, the Parent, and Coreva contrived to steer the distributors from the Debtor and force them to instead do business with the Parent and Coreva in

1    order to evade creditors of the Debtor.

2        120.    Predictably, this caused the Debtor to lose the business of these distributors.

3        121.    As a result of the breakdown of these economic relationships—as caused by the

4    Defendants—the Debtor has suffered economic harm in the amount of the revenue it would have

5    otherwise received from its relationship with distributors, and it will continue to suffer economic

6    harm as long as these actions are allowed to persist.

7                        **ELEVENTH CLAIM FOR RELIEF**

8        **Negligent Interference with Prospective Economic Advantage Against Defendants Core**

9        **Scientific Creations Ltd., Coreva Health Science LLC, Damian Delfino, Craig Bluth, and**

10                                **Cassie Inglis**

11        122.    The Trustee realleges and incorporates herein by reference each and every allegation

12    contained in all prior paragraphs of this Complaint.

13        123.    As described above, the Debtor had relationships with a number of distributors and

14    customers, to whom the Debtor sold the WoundClot product, and that contained a probable future

15    economic benefit to the Debtor.

16        124.    As officers of the Debtor, Delfino, Bluth, and Inglis were aware, or should have

17    been aware, that if they did not act with due care, their actions would interfere with those economic

18    relationships and cause the Debtor to lose probable future economic advantage.  Similarly, the

19    Parent and Coreva were also were aware, or should have been aware, that if they did not act with

20    due care, their actions would interfere with those economic relationships and cause the Debtor to

21    lose probable future economic advantage.

22        125.    The Defendants were negligent in their operation of or dealings with the Debtor.

23        126.    The Defendants' negligence caused—and will continue to cause—the Debtor

24    damage by disrupting and interfering with its economic relationships with distributors, which

25    caused the Debtor to lose the economic benefits it would have reasonably expected from those

26    relationships.

27    ///

28    ///

**TWELFTH CLAIM FOR RELIEF**

**Accounting of Property of the Estate Against Defendants Core Scientific**

**Creations Ltd. and Coreva Health Science LLC**

**[11 U.S.C. § 542]**

127.    The Trustee realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

128.    The Trustee is informed and believes and based thereon alleges that the Parent and Coreva may have received transfers of prepetition assets of the Debtor and are thus in possession of property of this Estate.

129.    Accordingly, the Parent and Coreva are both required to account for such Property as follows:

a.    The Trustee is entitled to an accounting for all transfers from the Debtor to the Parent, including, but not limited to, identification of which assets were transferred by the Debtor to the Parent and an accounting of each transfer that occurred from January 2017 to the present.

b.    The Trustee is entitled to an accounting for all transfers from the Debtor to the Coreva, including, but not limited to, identification of which assets were transferred by the Debtor to the Coreva and an accounting of each transfer that occurred from January 2017 to the present.

c.    Finally, the Trustee is entitled to an accounting for all prepetition assets the Debtors had in their possession, custody or control, and whether any prepetition property of the Debtors were sold, transferred, or otherwise alienated by the Debtors postpetition.

**THIRTEENTH CLAIM FOR RELIEF**

**Substantive Consolidation of Core Scientific Creations Ltd. and Coreva Health Science**

**LLC with the Debtor Against Defendants Core Scientific Creations Ltd. and Coreva Health**

**Science LLC**

130.    The Trustee realleges and incorporates herein by reference each and every allegation

contained in all prior paragraphs of this Complaint.

131.    The business, financial, and ownership relationships between the Debtor, Parent, and Coreva have been interconnected and entangled, as they have shared common ownership and management and have not been operated with the required respect for their respective separate legal existences (e.g., the Debtor's board apparently never met or kept minutes, the Parent's board and management exercised great control over the Debtor in tandem with the Debtor's management, and Coreva has now apparently taken over the Debtor's business and employs many of the same individuals).

132.    Consolidating the three entities is necessary to enable the Estate to recover the assets of the Debtor for the benefit of creditors, and this necessity greatly outweighs the potential harm—if any—to particular creditors of either the Parent or Coreva, especially given that these entities likely have closely overlapping obligations to a similar set of creditors.

133.    Creditors dealt with the Debtor, the Parent, and Coreva as a single economic unit—sometimes, at these entities' own insistence and contrary to the wishes of creditors—and these creditors did not rely on these entities' separate corporate existences when extending credit to the Debtor.

134.    Creditors will benefit from consolidation because the affairs of the Debtor, Parent, and Coreva are so closely tied together, as the management of the Debtor was often conducted for the benefit of the Parent and Coreva, and correspondingly, the Debtor's finances suffered to benefit the Parent and Coreva.

135.    The Trustee's avoidance powers should be preserved, effective as of the Petition Date, to enable and enhance the Trustee's ability to recover assets for the benefit of all creditors.

136.    The Parent and Coreva should both be substantively consolidated into the Debtor's Estate.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Trustee prays for a judgment hereon ordering the following relief.

**On the First Claim for Relief:**

1.    Compensatory damages and punitive damages from the Defendants Delfino, Bluth,

and Inglis jointly and severally, the exact amount of which to be proved at trial, and presently alleged to be no less than $2.2 million;

**On the Second Claim for Relief:**

2.      Compensatory damages and punitive damages from the Defendants Delfino, Bluth, and Inglis jointly and severally, the exact amount of which to be proved at trial, and presently alleged to be no less than $2.2 million;

**On the Third and Fifth Claims for Relief:**

3.      Avoiding and recovering the Transfers of the Debtor's monies and property, or the value thereof, for the benefit of the Estate, as well as all available relief under Cal. Civ. Code § 3439.07, including exemplary damages

**On the Fourth, Sixth, Seventh, and Eighth Claims for Relief:**

4.      Avoiding and recovering the Transfers of the Debtor's monies and property, or the value thereof, for the benefit of the Estate;

**On the Ninth Claim for Relief:**

5.      Compensatory damages from the Defendants, jointly and severally, the exact amount of which to be proved at trial, and presently alleged to be no less than $2.2 million;

**On the Tenth Claim for Relief:**

6.      Compensatory damages from the Defendants, jointly and severally, the exact amount of which to be proved at trial, and presently alleged to be no less than $2.2 million;

**On the Eleventh Claim for Relief:**

7.      Compensatory damages from the Defendants, jointly and severally, the exact amount of which to be proved at trial, and presently alleged to be no less than $2.2 million;

**On the Twelfth Claim for Relief:**

8.      Ordering the Defendants to provide detailed records of transactions involving the Debtor's prepetition assets and account for such property of the estate;

**On the Thirteenth Claim for Relief:**

9.      Substantively consolidating Core Scientific Creations Ltd. and Coreva Health Science LLC into the Debtor's Estate; and

1        10.    For such other further relief as the Court may deem appropriate.

2

3    Dated:  July 25, 2022               Respectfully submitted,

4                                  **ARENTFOX SCHIFF LLP**

5

6                           By: */s/ Dylan J. Yamamoto*

7                            Aram Ordubegian
                        Jerrold Abeles

8                            Dylan J. Yamamoto
                        General Bankruptcy Counsel for Jeremy W. Faith,

9                            the Chapter 7 Trustee

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AFDOCS/25583570.6